**John A. PENELLO, Regional Director of the Fifth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD**

v.

**RETAIL STORE EMPLOYEES LOCAL UNION NO. 692, RETAIL CLERKS INTERNATIONAL ASSOCIATION, AFL-CIO.**

**Civ. No. 12472.**

United States District Court
D. Maryland.
Sept. 23, 1960.

 

Washington, D. C., and Theodore K. High, Atty., NLRB, Cincinnati, Ohio, for petitioner.

Melvin A. Steinberg, Baltimore, Md., and Joseph E. Finley, Cleveland, Ohio, for respondent.

THOMSEN, Chief Judge.

### Facts

This proceeding is before the court on a petition of the Regional Director of the Fifth Region of the National Labor Relations Board, on behalf of the Board, pursuant to sec. 10($l$) of the National Labor Relations Act, as amended, 61 Stat. 149, 73 Stat. 544, 29 U.S.C.A. § 160 ($l$), for a temporary injunction pending the final disposition of a charge filed by Irvins, Inc., against respondent Union. The charge alleges that respondent has engaged in an unfair labor practice within the meaning of sec. 158(b) (7) (B),[1] set out at the beginning of the "Discussion", below, which proscribes recognitional and organizational picketing within twelve months after a valid election.

The petition filed herein is based on petitioner's conclusion that there is reasonable cause to believe that respondent has engaged in the unfair labor practice charged and that a complaint of the Board based on that charge should issue. The injunctive relief prayed is interlocutory to the final determination of the charge pending before the Board. This court must decide, from the evidence taken in this court proceeding, whether there is reasonable cause to believe that there has been such a violation and what relief is "just and proper". Sec. 160 ($l$).

Most of the facts are stipulated. The dispute is about the inferences and conclusions to be drawn from respondent's acts, and about the proper construction of sec. 158(b) (7).

### Findings of Fact

Irvins operates four department stores in Baltimore selling soft goods. It caters to a working-class clientele.

Stuart Rothman, Gen. Counsel, NLRB, Charles B. Slaughter, Atty., NLRB,

---

1. All section references herein are to Title 29 U.S.C.A.

All sales are for cash and there are few deliveries, but it is conceded that the requisite amount of interstate commerce is involved. Respondent is a labor organization within the meaning of secs. 152(5), 158(6) and (7) and 160(*l*).

Early in 1960 respondent began a campaign to organize the employees of Irvins, visiting their homes, mailing them literature, giving out leaflets at the stores, and obtaining "cards" signed by individual employees authorizing respondent to represent them for the purpose of collective bargaining. On May 6, 1960, respondent notified the Regional Director that it had been conducting such an organizational campaign for more than three months, and complained that the management had threatened to discharge employees who attended Union meetings.

On May 9 respondent filed with the Regional Director a petition for certification of representatives, seeking a unit of all employees in the employer's retail establishments, excluding all employees in the employer's warehouse and offices at 9 South Bond Street, watchmen, guards, drivers and supervisors. On May 26 a hearing was held on that petition, the sole issue being the composition of the appropriate unit for the purposes of collective bargaining. At the close of the hearing respondent withdrew its petition.

On May 31 respondent commenced picketing the Irvins' stores with signs reading: "Irvins refuses to recognize Local 692—Retail Store Employees Union—R.C.I.A., AFL–CIO".

On June 10 Irvins filed a charge under sec. 158(b) (7) (C), alleging in substance that the picketing was being conducted without a petition under sec. 159 (c) having been timely filed. On June 13 respondent filed a second petition for certification of representatives, similar to its earlier petition, but seeking an expedited election under sec. 158(b) (7) (C). On June 17 the Regional Director advised Irvins that its charge under sec. 158(b) (7) (C) had been dismissed. On the same day the Regional Director forwarded to Irvins and to respondent notice of an election, to be held on June 23.

On June 22 respondent filed charges alleging that "The Company, by its Officers and Agents, by acts of interference, such as intimidation, threats and coercion, and by other acts and conduct, it, by its Officers and Agents, interfered with, restrained and coerced its employees in the exercise of their rights guaranteed in Section 7 of said Act." The Regional Director postponed the election which had been scheduled for June 23, pending disposition of respondent's charges. On June 30 respondent filed further charges against Irvins, specifying the alleged acts of intimidation.

On July 8 respondent and Irvins entered into a settlement agreement disposing of the charges in both cases, pursuant to which Irvins posted notices set out in Note 2, below.

2.         "Notice
"To All Employees
"Pursuant to

"A Settlement Agreement Approved by the Regional Director of the Fifth Region of the National Labor Relations Board, and in order to effectuate the policies of the National Labor Relations Act, we hereby notify our employees that:

"We Will Not threaten our employees with loss of employment or employment opportunities with us or any other employers or with any other economic reprisals because of their membership in or assistance to Retail Store Employees Local Union No. 692, Retail Clerks International Association, AFL–CIO, or any other labor organization.

"We Will Not in any other manner interfere with, restrain, or coerce our employees in the exercise of their right to self-organization, to form labor organizations, to join or assist Retail Store Employees Local Union No. 692, Retail Clerks International Association, AFL–CIO, or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, and to refrain from any or all of such activities except to the extent that such right may be

On August 9 the Regional Director, having determined that a free and uncoerced election could be conducted, rescheduled the election for August 18, and notified the parties that a pre-election conference would be held on August 17. On August 15 respondent sent a telegram to Irvins requesting equal time to address the employees. No action was taken on this request.

On August 18 the election was held at the five voting places specified, respondent appearing as the only Union on the ballot. The election resulted in a clear defeat for the Union. On August 26 the Regional Director sent respondent and Irvins a Certificate of the Result of Election.

Meanwhile, on August 19, respondent had written Irvins as follows:

"In view of the results of the National Labor Relations Board election Retail Store Employees Union, Local No. 692, AFL–CIO, hereby withdraws any demands for collective bargaining representation for the Irvins store employees. Our Union does not intend to request recognition, nor will we accept recognition until the majority of the employees indicate their desire to be represented by our Union.

"However, due to your conduct and that of your supervisors, agents and representatives threatening, coercing and intimidating your employees, our Union feels that it is

obligated to the Baltimore Labor movement and the people of this city to inform them of your anti-union position. Labor-hating and labor-baiting are things of the past, our Union plans to advertise to the public what we consider your reprehensible anti-union position.

"We once again reiterate—we are not requesting nor will we accept recognition as the collective bargaining representative of your employees, until a majority indicate their desire to be represented by our Local Union."

Respondent continued its picketing of the four Irvins retail stores, changing its signs to read: "This is a Non Union Store. Irvins Opposes Union for its Employees. Please Do Not Patronize Retail Store. Employees Union Local 692—R.C.I.A., AFL–CIO".

On August 29 Irvins filed the charges against respondent under sec. 158(b) (7) (B), which are now pending before the Board.[3]

Before the election of August 18 respondent had stationed two pickets at each of the four stores; since the election one picket has been stationed at each store. On Mondays, Tuesdays and Wednesdays the pickets arrive at about 12:30 p. m. Before the election the pickets stayed until 5:30 on those days; since the election they have left at about 5:00 when the stores close. On Thursdays, Fridays and Saturdays the pickets

affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in Section 8(a) (3) or Section 8(f) of the Act. All our employees are free to become or remain members of this union, or any other labor organization, or to refrain from becoming or remaining members of this Union or any other labor organization.

"Irvins Stores, Inc."

---

**3.** The basis for the charge was stated as follows: "Since on or about August 18, 1960, and continuing to date the above named labor organization has engaged in picketing of Irvins, Inc., at its premises

at 3830 Eastern Avenue, 3430 Eastern Avenue, 5420 Harford Road, 1124 Light Street, Baltimore, Maryland, with an object to force and require Irvins, Inc. to recognize or bargain with the above-named labor organization as the representative of its employees and to force and require the employees of Irvins, Inc., to accept or select the above-named labor organization as their collective bargaining representative, notwithstanding that such labor organization is not currently certified as the representative of the employer's employees and notwithstanding that within the preceding 12 months a valid election under Section 9(c) of the Act has been conducted among the employer's employees."

arrive at about 1:30 p. m. Before the election they remained until about 9:15 or 9:30; now they remain only until the stores close at 9:00. None of the pickets is a present or former employee of Irvins. All are paid by respondent.

There has been no refusal to cross the picket line by persons making deliveries to Irvins. There is no evidence that respondent has made any attempt to interfere with persons making such deliveries.

Before the election the pickets handed out fliers to employees of Irvins as well as to its customers. Since the election the pickets do not attempt to distribute literature to the employees.

Respondent believes that the employees are still fearful because of the threats made by the management before the settlement agreement of July 8, despite the posted notices.

When asked "what do you hope to gain by the picketing?", respondent's organizer Buckner, the only witness called by either side, testified: "We hope to inform the public of Irvins Stores' anti-union acts. We hope to inform the public of Mr. Irving Perellis' anti-union attitude and what we consider vicious anti-union acts in forcing and intimidating his employees in an illegal manner. We hope to inform the Baltimore labor unions, in particular, and the public, in general, of this employer's reprehensible attitude." He also testified: "In the future we may well conduct an organizing campaign looking forward to election after the limit of one year is up, at which time we will be allowed to hold another election under the law." Finally, he testified that respondent would withdraw the pickets "if Mr. Perellis should see fit to call the employees together under similar circumstances on which he spoke to them before and personally reassure them that he would not carry out the threats he had previously made, and to further reassure the employees they would be subject to no pressure and would have a free choice in the selection of bargaining agent, and that he would invite us to also address the employees. Under those conditions it would be our feeling, or our belief, that the employees would then in reality be free of any coercion and able to make a free choice, and we would then withdraw the picket line and consider the affair closed, no matter which way the employees then decided."

For reasons set out in the "Discussion" below, I find as a fact from all of the evidence that there is, and that petitioner has, reasonable cause to believe that *an* object of the picketing since the election has been to force or require the employer, Irvins, to recognize or bargain with respondent as the representative of its employees. Another object has been to require the employees to accept or select respondent as their collective bargaining representative. Respondent seeks to attain these objects through pressure brought on Irvins and its employees *by customers and others incited by the picketing and by the statement made on the signs and in the handbills.*

## Discussion

Sec. 158(b) (7), as amended Sept. 14, 1959, 73 Stat. 544, reads as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\*    \*    \*    \*    \*    \*

"(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

"(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appro-

priately be raised under section 9(c) of this Act.

"(B) where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted, or

"(C) where such picketing has been conducted without a petition under section 9(c) of this Act being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c) (1) of this Act or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services."

■ Obviously, all picketing is not made illegal by these provisions. One or more of each of two sets of "where" clauses must be satisfied before the picketing can be held to be an unfair labor practice.

The first set of "where" clauses is in the first part of (7), quoted above, "to picket * * * where an object thereof" is either (a) forcing or requiring an employer to (1) recognize or (2) bargain with a labor organization as a representative of his employees, or (b) forcing or requiring the employees to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees.

The second set of "where" clauses is comprised of the three subparagraphs headed (A), (B), and (C).

The Landrum-Griffin amendments indicate a further drift by Congress from the Norris-LaGuardia view that the law has no useful role to play in labor disputes, toward a view that there is a need for greater stability in the organizational and recognitional areas of industrial relations. Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L.Rev. 257, 262–70 (1959). Sec. 158(b) (7) seeks to accomplish this objective. Subsection (A) deals with the problem where one union has already been lawfully recognized, (B) where a valid election has been held within the past year, and (C) where there has not yet been either recognition or an election.

■ No claim is made in the instant case under (A) or (C), but it is conceded by all parties that the case comes within (B): "where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted". In such a situation, i. e. within twelve months after a valid election, picketing is prohibited if the picketing has as *an* object any one or more of the objects set out in the first set of "where" clauses. The legislative history is clear on this point.

Dealing specifically with subparagraph (B), Secretary of Labor Mitchell, testifying before the Senate Labor Committee in support of S. 748, sometimes referred to as the Administration bill, which contained a provision identical with sec. 158(b) (7) (B) as ultimately adopted, stated (105 Cong.Rec. 1568, Feb. 4, 1959):

"After the employees have indicated their rejection of union representation they should be left free for a reasonable period of time from organizational efforts by picketing.

"The total effect of these proposals in the administration bill would be to regulate picketing so that employers and their employees will not be subject to the continuous coercion of an organizational picket line."

Senator Kennedy of Massachusetts, the Senate majority spokesman, who did not agree with all of the provisions of the Administration bill, nevertheless agreed that it would be advisable "to provide that for a certain period of time following a legitimate election, there could not be picketing" 105 Cong.Rec. 5959–5960, April 24, 1959. See also Note 4, below.

In reporting to the Senate on the bill as agreed upon by the Senate and House conferees, which contained sec. 158(b) (7) (B) as ultimately enacted, Senator Kennedy stated (105 Cong.Rec. 16415, Sept. 3, 1959):

"Subdivision (B) bars picketing for organization purposes or union recognition for 12 months after an election in order to secure the expressed desire of the employees."

■ The proviso with respect to informational picketing—the second proviso in subparagraph (C)—deals only with cases coming within subparagraph (C) and not with cases coming within subparagraph (B). This is clear, not only from the text of the statute itself, but also from the legislative history. In addition to the general statements cited above, the question was specifically covered by Congressman Griffin, a co-sponsor of the bill which passed the House, and a member of the Conference Committee, in commenting on the approved Conference Report.[5] He stated (105 Cong.Rec. A7915):

" * * * The proviso pertains to subsection (C) only and therefore consumer appeals for organizational

or recognitional purposes are banned after an election."

This conclusion is supported by Cavers v. Teamsters General Local No. 200, D.C.E.D.Wis.1960, 188 F.Supp. 184. The decision in Brown v. Department & Specialty Store Employees Union, D.C.N.D. Cal.1960, 187 F.Supp. 619, is not to the contrary, although some of the reasoning in the latter opinion is not clear to me. Of course, a court must keep in mind, even in a sec. 158(b) (7) (B) proceeding, that there may be picketing which is purely informational in character and which does not have any recognitional or organizational objective. Such picketing is permitted by sec. 158(b) (7), even during the year after an election, not because of the proviso in subparagraph (C), but because such picketing does not come within the first set of "where" clauses, which apply to subparagraphs (A) and (B) as well as to (C).

■ However, as the Second Circuit and the District of Connecticut have made clear in two cases dealing with subparagraph (C), the several objects and purposes are not mutually exclusive. McLeod v. Chefs, etc., Union (The Stork Club case), 2 Cir., 1960, 280 F.2d 760; Greene v. International Typographical Union, D.C.D.Conn.1960, 186 F.Supp. 630. Picketing in a particular case may have as *an* object forcing or requiring the employer to recognize or bargain with the union, and *also* have the purpose of advising the public that the employer does not have a contract with a union. Informational picketing may be one of the means selected by a union for obtaining recognition—immediately or ultimately. In such a case the picketing is permitted when there has been (A) no recognition of another union and (B) no election; in other words, it is permitted in a subparagraph (C) case, unless the picketing prevents pick-ups, deliveries or other services by the employees of other

4. Remarkably, both Senator Goldwater and Senator Morse agreed on this point. See 105 Cong.Rec. 5968–5969, April 24, 1959, and 105 Cong.Rec. 16398–16399, Sept. 3, 1959. See also Cavers v. Team-

sters General Local No. 200, D.C.E.D. Wis., 188 F.Supp. 184, which quotes these and other Congressional statements.

5. A similar report was made to the Senate (105 Cong.Rec. A8524).

persons. It would unreasonably prolong this opinion to quote from or discuss at length the several opinions cited above. I have considered carefully the reasoning of all those opinions, keeping in mind that subparagraph (C) cases present a somewhat different problem than the instant case. Nevertheless, they are helpful on many points.

The question for decision in this case, as in all subparagraph (B) cases, is whether the picketing after the election had one or more of the objects listed in the first set of "where" clauses.

■ It is generally conceded that the ultimate object of almost all union activity is to require all employers to recognize and bargain with the unions. But it would be unfair to apply that test in such a case as this; the test should be the reasonably immediate objectives of the union. Cavers v. Teamsters General Local No. 200, 188 F.Supp. 184.

Respondent concedes that its picketing before the election of August 18 had as its "objects" (1) the forcing of Irvins to recognize and bargain with respondent, and (2) the organization of the employees. The pickets gave handbills and other information to the employees, to customers and to the public generally. After the election the picketing continued without interruption, but the signs were changed, and the pickets did not try to get in touch with the employees. Respondent wrote a letter to the employer saying in effect that the purpose of the picketing had become purely informational and abjuring any recognitional or organizational object.

■ The court, however, is not bound to accept at face value the self-serving statements made by either side. Cavers v. Teamsters General Local No. 200, 188 F.Supp. 184. On the other hand "their prior objective should not *conclude* the unions from engaging in lawful activity at a later time" (emphasis added). McLeod v. Chefs, etc., Union, 280 F.2d at page 764. There is no presumption

that the objects of the picketing remain the same, but the court may infer the union's objectives from the totality of its conduct, before and after the election.[6]

■ The prior objective should be *considered,* along with the other evidence, in deciding whether the continued picketing has had as an object forcing the employer to recognize and bargain with the Union—not in the far distant future, not immediately, but within a reasonable time, before or shortly after the expiration of one year—by means, *inter alia,* of economic pressure brought on the employer by its customers and the public as a result of the picketing.

Granting that there must be substantial independent evidence to warrant the conclusion that an object of the picketing was recognitional or organizational, see The Stork Club case, there is such evidence in the case at bar. The statement of the witness Buckner that the Union would cease picketing now if, among other things, the company would allow the Union to speak to the employees, as well as the pre-election conduct of the Union, suggest the existence of the proscribed objective. Nor has the Union shown any other object of the picketing. Buckner stated that the Union was not trying to force Irvins out of business. The fact that the picketing had the proscribed objective may be inferred from the totality of the Union's conduct, viewed in the light of the normal objectives of such conduct. Cox, supra, Note 6.

■ Counsel for respondent also argues that its picketing in the present case is protected by the First Amendment, but cites no authority for this proposition. No doubt, Congress could not ban all picketing in every situation. Thornhill v. State of Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; American Federation of Labor v. Swing, 1941, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855. But it can ban picketing which defeats a valid public policy. Picketing

6. Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn. L.Rev. 257, 267 (1959).

"involve[s] more than just communication of ideas". International Broth. of Teamsters, etc. v. Vogt, Inc., 354 U.S. 284, 289, 77 S.Ct. 1166, 1169, 1 L.Ed.2d 1347, rehearing denied 1957, 354 U.S. 945, 77 S.Ct. 1423, 1 L.Ed.2d 1558. "'Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.' Bakery [and Pastry] Drivers Local v. Wohl, 315 U.S. 769, 776 [62 S.Ct. 816, 819, 86 L.Ed. 1178] (concurring opinion); see Carpenters [and Joiners] Union [etc.] v. Ritter's Cafe, 315 U.S. 722, 725–728 [62 S.Ct. 807, 808–810, 86 L.Ed. 1143]." International Broth. of Teamsters, etc. v. Vogt, Inc., supra, 354 U.S. at page 289, 77 S.Ct. at page 1169. See also Hughes v. Superior Court, 1950, 339 U.S. 460, 474, 70 S.Ct. 718, 94 L.Ed. 985; Madden v. International Hod Carriers', etc., Union, 7 Cir., 1960, 277 F.2d 688 at page 692. Congress, no less than a State legislature, in enforcing a valid public policy, can constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy. International Broth. of Teamsters, etc. v. Vogt, Inc., supra, 354 U.S. at page 293, 77 S.Ct. at page 1170. See also Building Service Employees Intern. Union, Local 262 v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045, rehearing denied 1950, 339 U.S. 991, 70 S.Ct. 1019, 94 L.Ed. 1391; Giboney v. Empire Storage & Ice Co., 1949, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834.

■ The public policy embodied in the statute being considered in the instant case is that an employer and his employees should be free for a reasonable time after an election from recognitional and organizational picketing. The Union may utilize other avenues of communication for obtaining those objectives; picketing alone is proscribed by sec. 158(b) (7), as amended. That statute is not unconstitutional.

## Conclusions

■ 1. There is reasonable cause to believe that respondent has engaged in an unfair labor practice within the meaning of sec. 158(b) (7) (B), affecting commerce within the meaning of secs. 152(6) and (7), and that a continuation of the practice will impair the policies of the Act as set forth in secs. 141(b) and 151.

■ 2. To preserve the issues for orderly determination, it is appropriate, just and proper that, pending the final adjudication of the Board, respondent, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with it or them, be enjoined and restrained from continuing their current picketing of Irvins, and from otherwise picketing or causing Irvins to be picketed or threatening to picket or cause Irvins to be picketed, during the remainder of the twelve months succeeding the date of the Certificate of Results of Election conducted among the employees of Irvins, which issued on August 26, 1960, where an object thereof is to force or require Irvins to recognize or bargain with respondent Union or any other labor organization as the representative of such employees, or to force or require such employees to accept or select respondent Union or any other labor organization as their collective bargaining representative.