John A. PENELLO, Regional Director of the Fifth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD

v.

WAREHOUSE EMPLOYEES UNION LOCAL NO. 570, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, and Truck Drivers and Helpers Local No. 355, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Civ. No. 15305.

United States District Court
D. Maryland.

May 11, 1964.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, and Julius G. Serot, Asst. Gen. Counsel, National Labor Relations Board, Washington, D. C., and David C. Sachs, Regional Atty., Henry L. Segal, Asst. Regional Atty. and Edward J. Gutman, Atty., National Labor Relations Board, Region 5, Baltimore, Md., for petitioner.

Jacob J. Edelman and Bernard W. Rubenstein, Baltimore, Md., for respondents.

THOMSEN, Chief Judge.

In this proceeding under sec. 10(*l*) of the National Labor Relations Act, as amended[1] (the Act), the Regional Director of the Fifth Region of the National Labor Relations Board (the Board) seeks a temporary injunction against Respondents, Warehouse Employees Union Local No. 570 and Truck Drivers and Helpers Local No. 355,[2] pending the final disposition by the Board of a charge filed by Whitaker Paper Company (Whitaker), alleging that Respondents have engaged and are engaging in an unfair labor practice within the meaning of sec. 8(b) (7) (C) of the Act.[3] That sub-section, added in 1959, provides in pertinent part:

"8(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

"(7) to picket or cause to be picketed \* \* \* any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees \* \* \* unless such labor organization is currently certified as the representative of such employees:

\* \* \* \* \* \*

"(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing \* \*."

The petition filed herein is based on Petitioner's conclusion that there is reasonable cause to believe that Respondents have engaged in the unfair labor practice charged and that a complaint of the Board based on that charge should issue. The injunctive relief prayed is interlocutory to the final determination of the charge pending before the Board. The Court must decide, from the evidence taken in this court proceeding, whether Petitioner had reasonable cause to believe that there had been such a violation and whether the injunctive relief requested is just and proper. Department & Specialty Store Emp. Union Local 1265, R. C. I. A. A.F.L.-C.I.O. v. Brown, 9 Cir., 284 F.2d 619, 628 (1961); Madden v. International Organization etc., 7 Cir., 259 F.2d 312, 313–314 (1958); McLeod for and on Behalf of N. L. R. B. v. Local 27, Paper Products & Misc. Chauffeurs etc., E.D.N.Y., 212 F.Supp. 57, 62 (1962); and Graham for and on Behalf of N. L. R. B. v. Retail Clerks Internat'l Ass'n Local No. 57, A.F.L.-C.I.O., D.C.Mont., 188 F.Supp. 847, 855–856 (1960). The principal question is whether sec. 8(b) (7) applies to the factual situation presented by this case.

---

1. Sept. 14, 1959, 73 Stat. 544; 29 U.S.C.A. 160(*l*).

2. Both affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

3. Added by sec. 704(c) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 525, 542, 544, sometimes referred to as the Landrum-Griffin Act; 29 U.S.C.A. § 158(b) (7) (C).

## Findings of Fact

There is little if any dispute about the basic facts, none about the jurisdictional facts set out in note [4] below.

Whitaker is a distributor of paper products in the Baltimore area. For a number of years Respondents have entered into separate collective bargaining contracts with Whitaker covering the wages and employment conditions of its drivers, helpers and warehousemen, although neither Respondent is currently certified within the meaning of sec. 9(c) of the Act, 29 U.S.C.A. 159(c), as the representative of any of Whitaker's employees.[5] The most recent agreements ran for one year and expired on September 30, 1963. Negotiations for new agreements were commenced in August 1963. The unions sought an increase in wages and fringe benefits, while Whitaker sought a substantial decrease in wages, claiming that it was at a competitive disadvantage with certain other paper companies in the Baltimore area. The parties were unable to reach an agreement, and on October 1, 1963, all sixteen of Whitaker's employees who were represented by Respondents began a strike, the purpose of which was to exert economic pressure on Whitaker in furtherance of Respondents' bargaining demands raised during the negotiations for new collective bargaining contracts. On the same day, October 1, pickets carrying signs bearing Respondents' names and stating that Whitaker was "unfair" appeared at Whitaker's premises. Those premises have been picketed peacefully ever since and no change has occurred in the legend on the pickets' signs.

On October 2 Whitaker began to hire permanent replacements for its employees engaged in the strike, and by October 8 Whitaker had hired permanent replacements for all the striking employees.

4. 1. Petitioner is Regional Director of the Fifth Region of the Board, an agency of the United States, and filed the petition herein for and on behalf of the Board.

2. On or about January 24, 1964, Whitaker Paper Company, pursuant to the provisions of the Act, filed charges with the Board alleging, inter alia, that Warehouse Employees Union Local No. 570, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and Truck Drivers and Helpers Local No. 355, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, labor organizations, have engaged in, and are engaging in, unfair labor practices within the meaning of Section 8(b) (7), subparagraph (C), of the Act.

3. The aforesaid charges were referred to Petitioner as Regional Director of the Fifth Region of the Board.

4. There is, and Petitioner has, reasonable cause to believe that:

(a) Respondents, unincorporated associations, are organizations in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(b) Respondents maintain their principal offices at Baltimore, Maryland, and at all times material herein Respondents have been engaged within this judicial district in transacting business and in promoting and protecting the interests of the employee members of Respondents.

(c) Whitaker is engaged at Baltimore, Maryland, in the sale and distribution of paper products and building materials. In the operation of its business, Whitaker annually receives goods, materials and products valued in excess of $50,000 directly from outside the State of Maryland, and annually ships goods, materials and products valued in excess of $50,000 directly to points located outside the State of Maryland.

(d) The acts and conduct of Respondents set forth in the Findings of Fact in this opinion (i. e. the picketing) have a close, intimate, and substantial relation to trade, traffic, and commerce among the several states and tend to lead to and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

5. It may fairly be anticipated that, unless enjoined, Respondents will continue and repeat the acts and conduct set forth in the Findings of Fact, or similar or like acts and conduct.

5. In 1948, when the law required an election among the employees to determine whether or not they would authorize the unions to enter into a "union shop agreement", the employees of Whitaker voted to authorize such a provision.

On October 16 a meeting was held with a Federal Mediator or Conciliator, at which the parties reviewed the previous negotiations and the attorney for Whitaker took the position that there really wasn't anything to discuss at that meeting because the company had succeeded in permanently replacing all of the striking employees, and the union no longer represented a majority of the employees. After talking to each side separately, the Mediator stated there was nothing further he could do. Whitaker refused to continue negotiations.

On the same day, October 16, Respondents filed charges with the Regional Director, Petitioner herein, each alleging that "since on or about October 1, 1963 the Company has refused to bargain with the Union although the Union as the bargaining agent has represented the employees of the employer since 1937 and has had Collective Bargaining Agreements since that date." The Regional Director conducted an investigation of the matter alleged in the charges, but found insufficient evidence of a violation and declined to proceed further. He stated:

"As a result of the investigation, it appears that the Employer's position in bargaining with both Unions was that it desired a substantial reduction in labor costs to bring its rates in line with those of its competitors including one competitor represented by the same Unions. Further, it appears that before the position could be developed as to exact amount of reduction, the Unions called a strike (after only two fully represented negotiation sessions) and the strikers were permanently replaced. In view of the above circumstances, it does not appear that the Employer took its initial position with the intention of instigating a strike nor is it established that the Employer negotiated in bad faith. Accordingly, further proceedings are not warranted at this time, and I am, therefore, refusing to issue complaint in these matters."

Thereupon, pursuant to sec. 102.19 of the Board's Rules and Regulations, Series 8, as amended, Respondents appealed to the General Counsel of the Board. On January 21, 1964, the General Counsel notified the Unions that he was sustaining the Regional Director's refusal to issue a complaint in the matter, stating:

"It was concluded that, under the circumstances disclosed, including the Union's concession that the Company did not engage in any conduct *per se* violative of Section 8(a) (5) and the statement made by Union witnesses that negotiations were broken off by the Union because the Company would not grant any increases in wages, the burden of establishing overall bad faith bargaining on the part of the Company could not be sustained."

Respondents continued to picket, and on January 24, 1964, Whitaker filed charges alleging violations of sec. 8(b) (7) (C). No petition under sec. 9(c) for an election to determine whether the employees desired to be represented by the Unions or, indeed, by any union, has ever been filed by either Whitaker or Respondents.

On February 14, the Regional Director filed his petition herein, alleging inter alia:

" * * *

"5. Upon the basis of the following, Petitioner has reasonable cause to believe that said charges are true and that a complaint of the Board based on said charges should issue against Respondents pursuant to Section 10(b) of the Act. More particularly, Petitioner has reasonable, cause to believe, and believes, * * *

* * * * * *

"(g) In furtherance of the aforesaid demands for recognition and bargaining, Respondents, since on or about October 16, 1963, have picketed Whitaker.

"(h) The aforesaid picketing has been conducted for more than thirty (30) days without the filing of a peti-

tion under Section 9(C) of the Act for a Board election.

"(i) An object of Respondents' picketing set forth in subparagraphs (g) and (h) above, is to force or require Whitaker to recognize or bargain with Respondents as the representative of Whitaker's employees, notwithstanding that neither Respondent is currently certified as the representative of such employees."

## Discussion

The picketing in this case began on October 1, 1963, in aid of an economic strike called by Respondents, which had been recognized for many years by Whitaker as the bargaining agents for its chauffeurs and warehousemen. Petitioner concedes that sec. 8(b) (7) did not apply to the original picketing, but contends that sec. 8(b) (7) (C) became applicable later, after Whitaker had hired replacements and had questioned whether Respondents still represented a majority of the employees. Respondents argue that Petitioner's contention is not supported by the legislative history or the adjudicated cases, and that it does violence to the intent and structure of the Act. No case in point has been cited by either side.

### (a) General Principles

Until the 1959 amendments became effective, the Act, with some exceptions not pertinent here, did not expressly prohibit a union from picketing an establishment to compel the employer to recognize it as the bargaining agent of his employees or to compel the employees to join or select the union as such bargaining agent. As a result, a union which did not represent a majority of the employees in the plant, and frequently represented only a small minority or no employees at all, was permitted to engage freely in recognitional or organizational picketing. Such picketing was sometimes called "blackmail" picketing.

Sec. 8(b) (7) was one of the amendments which Congress adopted in 1959 to correct what it considered to be "loopholes" or deficiencies in the Act. Although the legislative history makes it clear that "blackmail" picketing was the evil with which Congress was predominantly concerned, the language of the statute as ultimately enacted went beyond mere correction of that evil.[6] Dayton Typographical Union No. 57 v. N. L. R. B., D.C.Cir., 326 F.2d 634, 636 (1963). See also Roumell v. Local 154, International Typographical Union, E.D.Mich., 49 LRRM 2844 (1962); Getreu v. Bartenders etc., N.D.Ind., 181 F.Supp. 738 (1960), both of which dealt with recognitional picketing that began before the effective date of the 1959 amendments. It is not clear, however, whether Congress intended sec. 8(b) (7) (C) to apply in the situation presented by this case.

Sec. 8(b) (7) prohibits picketing by a union which is not currently certified where "an object" of the picketing is forcing or requiring an employer to recognize or bargain with a union—(A), if another union has been lawfully recognized and an existing contract with that union bars an election; (B), if a valid election has been held among the employees by the Board during the preceding twelve months, or (C), if such picketing has been conducted for more than a reasonable period, not to exceed 30 days, without the filing of a petition for an election under sec. 9(c) of the

6. See particularly Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, published by the N. L. R. B., U. S. Government Printing Office, Washington, D. C., 1959, vol. 2, pp. 1593–94, speech of Rep. James Roosevelt in favor of the Shelley Bill rather than the Landrum-Griffin Bill for the reason, inter alia, that the provision of the latter Bill involved in the present case was so broad that it would cover situations generally similar to the facts of this case; pp. 1687–88, speech of Rep. Clem Miller in support of the Elliott Bill for substantially the same reason and particularly the wide coverage of what became sec. 8(b) (7) ; and p. 1689, similar remarks of Rep. O'Hara. A list of 89 additional page references more or less helpful in considering this point has been filed with the Clerk, but need not be published.

Act. The latter section, in its various subparagraphs, provides not only for Board elections upon petitions filed by employees or their representatives, or by employers, for the purpose of determining whether the employees desire to be represented by a labor organization for collective bargaining purposes, but also for Board elections upon petitions by either the employees or the employer to decide whether a presently recognized collective bargaining agent remains the designated representative of the employees.

Petitioner argues as follows:

"Before the replacements were hired and prior to Whitaker's withdrawal of recognition there existed no question of the Unions' status as bargaining agents, and thus no question of representation within the meaning of Sec. 9(c). In such a posture, proceedings under Sec. 9(c) could not have been entertained. Under such circumstances, the Unions could continue to picket free from any legal restraint in furtherance of their bargaining demands, to exert economic pressure upon Whitaker to compel some type of change in the latter's policy towards negotiations or to protest Whitaker's course of conduct during negotiations. However, if through circumstances the Unions were to lose their status as majority representatives or *if some legitimate doubt as to their status arose and recognition were withdrawn*, they would no longer enjoy the same privileges insofar as their right to picket was concerned. At such a point in time, a question of representation within the meaning of Sec. 9(c) would be said to exist. From such a point on, even if no

change in the legends on the signs appeared or even if the Unions claimed no change in object, an inference must be drawn that 'an object'[7] of their conduct was one of those proscribed by Sec. 8(b) (7). If no petition were filed within the reasonable time referred to, 8(b) (7) (C) has been violated."

 Respondents deny that picketing by a recognized union for an economic object can be brought within the provisions of sec. 8(b) (7) simply because the employer thereafter hires replacements for the strikers and challenges the representation of the union. They argue that such a construction gives the employer an opportunity to choose the time when an election shall be held and puts the union at an unreasonable disadvantage. That argument, however, should be addressed to the Congress. There are policy arguments in favor of allowing a union to continue picketing in such a situation, and policy arguments against it. But the Court must take the statute as it stands, with such aid from the legislative history and judicial decisions as may be available. Although, as noted above, the outlawing of blackmail picketing was the evil with which Congress was predominantly concerned, the clear language of the statute, as it was ultimately enacted, goes beyond mere correction of that evil. Dayton Typographical Union No. 57 v. N. L. R. B., supra, 326 F.2d at 636. If "forcing or requiring an employer to recognize or bargain with a labor organization as a representative of his employees" has *in fact* become "an object" of the picketing, whether or not it was an original object, the provisions of sec. 8(b) (7), as properly construed, must be applied.

7. At this point petitioner added the following footnote: "As long as one of the Unions' objects was illegal it is immaterial that it might also have other legitimate objects. Penello [for and on Behalf of N. L. R. B.] v. Retail Store Employees [etc.], 188 F.Supp. 192, 199 (D.C.Md.), aff'd 287 F.2d 509 (C.A.4)." In that

case, however, the union had never been certified or recognized by the employer, the original picketing had been for recognitional or organizational purposes and had continued, in violation of sec. 8(b) (7) (B) after the union had lost an election. Sec. 8(b) (7) (C) was not involved.

As the quotation from his brief shows, petitioner has taken the position that whenever a legitimate doubt arises whether a union has lost its status as a majority representative, and the employer withdraws recognition of the union or questions its status, then an inference *must* be drawn that "an object" of any subsequent picketing is recognition or organization.

■ That contention goes too far. There may be a real doubt whether and when an additional object has been acquired by picketing which originally had an economic object. The withdrawal of recognition or the questioning of the unions' status by the employer may be formal or informal, bona fide or mala fide, serious or frivolous. This Court is not prepared to rule that whenever the representation of a union is questioned by an employer, it automatically follows that forcing or requiring the employer to recognize or bargain with the union necessarily becomes an object of picketing which did not theretofore have that object. Whether or not the picketing has acquired such an object is a question of fact which must be determined eventually by the Board. In a proceeding to which sec. 10(*l*) is applicable, the Regional Director must first determine, inter alia, whether there is reasonable cause to believe that the picketing has acquired the specified object; if he makes such a finding and files a petition in a district court under sec. 10(*l*), the court must determine from all the evidence presented to it whether the Regional Director's decision is supported by substantial evidence and was in accordance with law. Of course, the Board, the Regional Director and the Court may draw reasonable inferences in determining the essential facts.

An employer is not without remedy in the situation here presented. It may call for an election after it has hired replacements for the strikers and, if the election results adversely to the union, may charge a violation of sec. 8(b) (7) (B). A vote favorable to the employer would support the contention that forcing the employer to recognize the union had become, necessarily or in fact, an object of any subsequent picketing and bring sec. 8(b) (7) (B) into play.

### (b) This Case

■ When the strike was called and the picketing began on October 1, there was no question of Respondents' status as bargaining agents. The sole object of the picketing was economic. Immediately after the meeting with the Mediator on October 16, Respondents filed charges under sec. 8(a) (5), which, if sustained, would have destroyed the permanent character of the employment of the replacements and their voting rights in any election under sec. 9(c), and this would have prevented the successful prosecution of the charges under sec. 8(b) (7) (C) upon which this sec. 10(*l*) proceeding is founded.[8] Until Respondents' charges were finally adjudicated, a protest against the allegedly unfair labor practice may well have been the principal if not the only object of the picketing.

The General Counsel's ruling adverse to Respondents was filed on January 21, 1964. Whitaker filed its 8(b) (7) (C) charges against Respondents on January 24. The pending petition was filed in this Court by the Regional Director on February 18.

The petition alleges that "Petitioner has reasonable cause to believe and believes, that * * * Respondents have

8. The fact that Respondents filed an unfair labor practice charge based on an alleged violation of sec. 8(a) (5) which was rejected by the General Counsel for the reasons set out in the Findings of Fact, supra, prevents Respondents from raising the issue of Whitaker's alleged bad faith in bargaining as a defense in this case, but the refusal of the Regional Director and the General Counsel to issue the complaint did not automatically make sec. 8(b) (7) applicable, although the issuance of a complaint based on the charge would have removed the case from the ambit of sec. 8(b) (7) (C). Dayton Typographical Union No. 57 v. N. L. R. B., supra, 326 F.2d at 647, 648.

engaged in, and are engaging in, acts and conduct in violation of" sec. 8(b) (7) (C). If Petitioner had reached that determination by applying proper legal principles to the facts, there is evidence in the record which might support such determination. But Petitioner's brief indicates that he reached his belief that Respondents have engaged in and are engaging in acts and conduct in violation of sec. 8(b) (7) (C) by applying an erroneous legal standard, namely, that Respondents' right to picket changed automatically on October 16, when the employer raised a bona fide question as to Respondents' status and withdrew its recognition. Petitioner's brief states: "From such a point on, even if no change in the legends on the signs appeared or even if the Unions claimed no change in object, an inference must be drawn that 'an object' of their conduct was one of those proscribed by Sec. 8(b) (7). If no petition were filed within the reasonable time referred to, 8(b) (7) (C) has been violated."

██ Since the determination of the Regional Director, which is a prerequisite to his maintenance of the present petition, was based on an erroneous view of the law, it would not be just and proper to issue an injunction on a petition based upon that determination.[9] This Court will therefore dismiss the present petition, but without prejudice to the right of the Regional Director to make a new determination based upon an application to the facts of the principles of law stated herein and, if such determination warrants, to file a new petition in this Court.

### Conclusions of Law

1. This Court has jurisdiction of the parties and of the subject matter of this proceeding.

2. The determination of the Regional Director that he had reasonable cause to believe that Respondents had engaged in acts and conduct in violation of sec. 8(b) (7) (C) was based upon an erroneous view of the law.

3. The injunction prayed for would not be just and proper, and should be denied, without prejudice.

Counsel may prepare an appropriate order.

---

9. Even if it should be held that the object of Respondents' picketing changed automatically or in fact upon the decision of the General Counsel on January 21, 1964, that no action should be taken on Respondents' 8(a) (5) charge (a question which it is not necessary for the Court to decide at this time), the present petition, which was filed less than thirty days thereafter, is insufficient in that it does not allege that the recognitional picketing had continued for an unreasonable period of time after January 21.