Robert E. GREENE, Acting Regional Director of the First Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

INTERNATIONAL TYPOGRAPHICAL UNION and Local 285, Ansonia Typographical Union, International Typographical Union, Respondents.

No. 8136.

United States District Court
D. Connecticut.

Aug. 5, 1960.

Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, Julius G. Serot, Washington, D. C., Robert S. Fuchs, Boston, Mass., Eugene R. Jackson, Joseph I. Nachman, N. L. R. B., Washington, D. C., for petitioner.

Norman Zolot, Hamden, Conn., for Local 285 ITU.

Gerhard Van Arkel, Washington, D. C., specially appearing for respondents.

ANDERSON, District Judge.

On January 21, 1960 this court issued a temporary injunction against the defendants after finding that they had been picketing for more than thirty days after November 13, 1959 in violation of Section 8(b) (7) (C) of the Taft-Hartley Act, 29 U.S.C.A. § 158(b) (7) (C), with an object of forcing or requiring Charlton Press, Inc. to recognize or bargain with them as the collective bargaining representative of Charlton's composing room employees without the filing of a representation petition under Section 9(c) of the Act. The terms of the temporary injunction [1] expressly ex-

1. D.C., 182 F.Supp. 788.

cepted picketing permitted under the second proviso of Section 8(b) (7) (C). For a substantial part of the time since January 21, 1960, the unions' members have been picketing in front of the employer's place of business by sitting in automobiles on which were affixed signs which said,

"To the public: this is to inform you that Charlton Press, Inc. does not have a contract with Ansonia Typographical Union 285. This information should not be taken to induce any person in the course of their employment not to pick up, deliver, or transport any goods or not to perform any services. This picket sign should not cause any one not to perform such services or cross the picket line. I.T.U. 285, AFL-CIO."

There was no evidence that as a result of this picketing, or even following this picketing, there was any reaction by employees of other employers, by other employees of Charlton Press, Inc., by other organized labor groups or any of their members or by any member of the unorganized public which in any way affected the employer or any of its remaining employees. The picketing unions did not notify the employer subsequent to January 21, 1960 that they no longer sought recognition or bargaining, nor was there any evidence that the unions since that date sought from or made demand upon Charlton Press, Inc. for recognition or bargaining. The local union has pending before the N.L.R.B. an unfair labor practice charge based upon the employer's refusal to recognize or bargain and it has not withdrawn this charge. On the basis of this set of circumstances the N.L.R.B. petitioned this court to find the unions in contempt of the temporary injunction, thus bringing into issue for determination by this court the question whether or not the picketing practiced by the unions since January 21, 1960 comes within the permissive scope of the second proviso of Section 8(b) (7) (C).

Since the hearing on this show cause order the Court of Appeals has handed down a decision in McLeod, Regional Director v. Chefs, Cooks, Pastry Cooks and Assistants, Local 89 et al., 2 Cir., 280 F.2d 760, hereinafter referred to as the Stork Club decision. In that case the trial court had found that the unions had, as one of their objectives, that of forcing the employer to recognize and bargain with them. Although the language on the pickets' signs was strictly within the permitted limits of the second proviso of Section 8(b) (7) (C), the trial court found that the use of signs with this informational wording, following approximately three years of picketing to force or require the employer to bargain with or recognize the unions, was sufficient to warrant the conclusion that the original purpose still underlay the informational picketing, and the court, therefore, enjoined it. The Court of Appeals held that there was no proper factual basis for the trial court's conclusion because:

1. "the fact that the union carried signs expressly allowed by the statute should not be a basis for concluding that the union had a recognitional objective" and

2. "their (i. e. the unions) prior objective should not conclude the unions from engaging in lawful activity at a later time."

The Court of Appeals decision also dealt with the exception to the second proviso, where economic consequences are involved. The present case is not concerned with this exception so that the discussion will be limited to an interpretation of the second proviso as it applies to the facts of the case. These facts differ from the Stork Club case in that, while they both had a history of many months of picketing to force or require the employer to bargain with or recognize the union up until a certain time following the effective date of the Labor Management Reporting and Disclosure Act of 1959, Public Law 86–257, 73 Stat. 519, 544, when picketing with signs containing nothing but wording permitted under the second proviso of Paragraph

7(C) of that Act was adopted,[2] the hearing in the present case produced evidence showing that, since the adoption by the unions of picketing by using only signs with permissible second-proviso wording on them, the leaders of the unions and the unions themselves have carried on such informational picketing in the hope and desire that as a result of it, they could bring about bargaining with the employer as to terms and conditions of employment which in turn would result in the employer's hiring the employees under an employment agreement satisfactory to the unions. Moreover, the unions have asserted that the whole controversy with the employer, out of which all the picketing has arisen, stemmed from an unfair labor practice by the employer and the unions still have charges based upon this pending before the N.L.R.B. and the unions not only have refused to waive these charges, but insist upon processing them to a conclusion. It has also been stipulated as part of the facts in the case that the unions have never notified the employer that they no longer seek recognition or bargaining. It may also be said that there is no evidence that the unions have, since January 21, 1960, expressly sought recognition from or bargaining with the employer.

The question in the case, then, is whether under these factual circumstances the picketing constitutes acts in violation of the terms of the temporary injunction of this court, issued January 21, 1960, which expressly excepted second-proviso picketing.

Looking at Section 8(b) (7) of the 1959 Act as a whole, it is apparent that it does not proscribe all picketing but only that which comes within the terms of the "where" clauses. For an unfair labor practice by the union to exist under 8(b) (7) (C) on the facts here alleged, the picketing must have been carried on under two conditions both of which must be operative at the time: 1. the picketing must have had as an object the forcing or requiring of an employer to recognize or bargain with a labor organization, etc.; and 2. such picketing must have been conducted without a petition under 9(c) having been filed within a reasonable period of time not to exceed 30 days, etc. (subsection C).

It would appear prima facie that these two conditions exist here, but the second of these conditions is limited by two provisos and this case is particularly concerned with the second of these provisos which says, "nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, * * *."

If, therefore, the unions' picketing in this case came strictly within the provisions of the second proviso and nothing more, then the main provision of subparagraph C would be inoperative and, therefore, the second of the two "where" clauses, the existence of both of which are required for the finding of an unfair labor practice under Section 8(b) (7), would not apply.

There is no evidence that the picketing in this case consisted of anything more than the employees' parking or driving, near the employer's place of business, in automobiles on which were signs which bore language entirely within the permissible limits of the second proviso; nor, as noted above, is there anything in this case to bring it within the exception to the second proviso of Section 8(b) (7) (C), i. e. the clause which reads, "Unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services."

2. In the Stork Club case this was done on the advice of counsel for the Unions; in the present case it followed the temporary injunction issued by this court January 21, 1960.

Ordinarily it would appear that the case is one squarely within the second proviso and this should end the matter.

The N.L.R.B., however, argues that in spite of an ostensible showing of pursuing a purpose of truthfully advising the public as set forth in the second proviso, the unions and their leaders actually never abandoned the objective of forcing or requiring the employer to bargain with or recognize the unions, and refer to the testimony of the local union's officials who said that it was their hope and desire that the picketing would result in getting the employer to sit down and talk with them and eventually rehire the employees on terms and conditions agreeable to the unions. This claim by the N.L.R.B. confuses an *immediate* purpose with an *ultimate* objective and fails properly to interpret congressional intention in dealing with those two things. When Congress placed the second proviso in Section 8(b) (7) (C) it could hardly have been so naive as to suppose that the unions in making use of it would be motivated solely by the urge to inform and educate their fellow men. Picketing is a weapon used by the union in a contest with employers. They picket under the second proviso "for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of or have a contract with a labor organization." Why? Because the union hopes to win sympathetic or cooperative action from the public which in turn will, through some sort of influence or pressure, bring the employer around to doing what the signs say he is not doing, i. e. dealing with the union. The N.L.R.B.'s position is that if the immediate, intermediate or ultimate object of the picketing is for recognition or bargaining, the picketing, ipso facto, cannot qualify under the second proviso. It considers that Section 8(b) (7) deals with organizational or recognitional picketing except for the second proviso which deals with an entirely separate kind or category of picketing and that the two categories are somehow mutually exclusive. It seems, however, much more realistic to suppose that Congress framed a general rule covering the field of recognitional and organizational picketing and then excepted from the operation of the rule a comparatively innocuous species of picketing having the immediate purpose of informing or advising the public, even though its ultimate object was success in recognition and organization.

In this connection what is meant by "advising the public," as used in the second proviso, is very important. Congress expressly provided that the word "public" should not be so narrowly construed as to exclude consumers, but the whole context of the phrase in which it appears makes it clear that it was not intended to be so broadly defined as to include organized labor groups which, at a word or signal from the picketeers, would impose economic sanctions upon the employer; otherwise Section 8(b) (7) would be, in effect, almost entirely emasculated. By this latest amendment to the Taft-Hartley Act Congress sought to circumscribe a kind of picketing which, by its nature, could in most cases bring an employer to his knees by threatening the destruction of his business and which, because of the attendant loss of employment, had a material tendency to coerce employees in their freedom to accept or reject union membership or freely select the union they wanted to represent them.

Professor Cox of Harvard, who worked with the Senate Labor Committee Chairman on the Section 8(b) (7) amendment to the Taft-Hartley Act, has said,

"Picketing before a union election is divided by section 8(b) (7) into two categories: (1) picketing which halts pick-ups or deliveries by independent trucking concerns or the rendition of services by the employees of other employers, and (2) picketing which appeals only to employees in the establishment and members of the public. * * * The theory is that the former class of picketing is essentially a signal to organized economic action backed by group discipline. Such economic

pressure, if continued, causes heavy loss and increases the likelihood of the employer's coercing the employees to join the union. In the second type of picketing, the elements of communication predominate. If the employer loses patronage, it is chiefly because of the impact of the picket's message upon members of the public acting as individuals. * * * "

The Landrum-Griffin Amendments to the NLRA 44 Minnesota Law Review 257.

■ Although the two categories are described by him in terms of the *effect* of each, the express language of the second proviso uses the words "for the purpose of" and it is difficult to see how they can be ignored. Nevertheless, the description of the two categories is helpful in gaining insight to the second proviso. The concepts of "signal" picketing and "publicity" picketing should be used in characterizing the union's tactical purpose rather than in describing the picketing's effect. Yet purpose can be determined only through what is said and done under certain circumstances; and the effect of the picketing is one of the circumstances considered in determining in any case what the purpose was. But under the second proviso it is the difference in purpose which determines which is permissible picketing and which is not. In its context the second proviso means in terms of "signal" and "publicity" picketing that while most picketing with a "signaling" purpose is proscribed, most picketing for publicity is protected; the exceptions are that signal picketing is permissible when an object thereof is not forcing or requiring an employer to recognize or bargain, and publicity picketing is proscribed when it communicates more than the limited information expressly permitted by the second proviso or when it is apparently the purpose to advise organized labor groups or their members as shown by signal effects, unless those effects are inspired by the employer who is seeking thereby to prevent legitimate second-proviso picketing by the union.

The permissible picketing is, therefore, that which, through the dissemination of certain allowed representations, is designed to influence members of the unorganized public, as individuals, because the impact upon the employer by way of such individuals is weaker, more indirect and less coercive. The word "public" might properly include other employees of the employer who belonged to no union but would not include other employees of an employer belonging to another union representing some other bargaining unit in the employer's plant.

On this construction of the second proviso, it is concluded that the activities of the unions subsequent to January 21, 1960 were entirely within the permissible area of this proviso. Such activities are completely excepted from the prohibition against picketing which has "as an objective one of forcing or requiring the employer to bargain with or recognize the union." The candidly expressed hopes and aspirations of the unions' officials and of the picketing employees, the failure to give some kind of notice to the employer that bargaining or recognition were no longer sought and refusal by the unions to withdraw an unfair labor charge against the employer do not, under this construction of the statute, take the case out of the area of second-proviso picketing. Put in terms of the opinion in the Stork Club case, the evidence of these facts which are present here and which are sought to be used to distinguish this case, is not competent to conclude the unions from second-proviso picketing nor does it furnish a proper basis on which to conclude that, in the terms of Section 8(b) (7), the unions had as an objective, one of forcing or requiring the employer to bargain with or recognize the unions.

There was no evidence that any effect of the picketing was to induce any individual employed by any other person in the course of his employment not to pick up, deliver or transport any goods or not to perform any services.

The petition is, therefore, dismissed.