Thomas P. GRAHAM, Jr., Regional Director of the Nineteenth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

RETAIL CLERKS INTERNATIONAL ASSOCIATION, LOCAL NO. 57, AFL–CIO, Respondent.

Civ. No. 2141.

United States District Court
D. Montana,
Great Falls Division.

Oct. 25, 1960.

Stuart Rothman, Dominick L. Manoli, Winthrop A. Johns, Washington, D. C., Patrick H. Walker, Seattle, Wash., Walter N. Moldawer, Washington, D. C., and Melton Boyd, National Labor Relations Board, for petitioner.

Leo C. Graybill, Jr., Great Falls, Mont., for respondent.

JAMESON, District Judge.

This proceeding comes before the court upon a petition filed by the Regional Director of the National Labor Relations Board pursuant to section 10(*l*) of the National Labor Relations Act, as amended, 61 Stat. 149; 73 Stat. 544; 29 U.S. C.A. § 160(*l*) (hereinafter referred to as the "Act"), for a temporary injunction pending a final adjudication by the Board of a charge filed with it by Hested Stores Company (hereinafter referred to as "Hested"). The charge alleges that the respondent is engaged in an unfair labor practice within the meaning of section 8(b) (7) (B) of the Act, which proscribes recognitional and organizational picketing where a valid election under section 9(c), 29 U.S.C.A. § 159(c), has been conducted within the preceding twelve months.[1] The petition is predi-

---

1. Section 8(b) (7), 73 Stat. 544, 29 U.S. C.A. § 158, reads as follows:
   "§ 8(b) It shall be an unfair labor practice for a labor organization or its agents—
   \* \* \* \* \*
   "(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
   "(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9 (c) of this Act,
   "(B) where within the preceding twelve months a valid election under section 9 (c) of this Act has been conducted, or
   "(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a peti-

cated upon the conclusion of the Regional Director that there is reasonable cause to believe that the respondent has engaged in the unfair labor practice charged and that a complaint of the Board based upon the charge should issue.[2]

Hested, a corporation with its principal office and place of business at Fairbury, Nebraska, is engaged in the sale of variety merchandise to the public, through a chain of retail outlets in a nine-state area with an annual gross volume in excess of $10,000,000. Hested annually receives at its Great Falls, Montana, store, goods and commodities for resale valued in excess of $50,000 which are shipped to it directly from sources outside the State of Montana.

■ Respondent Retail Clerks International Association, Local 57, AFL–CIO (hereinafter referred to as "Local 57" or as "respondent") is a labor organization [3] which maintains its principal office at Great Falls, Montana, and at all times material herein has been engaged within this judicial district in transacting business and in promoting and protecting the interests of its employee-members.[4]

In January, 1960, Hested was planning to open its Great Falls store. On January 9, Joe Meyer, the business agent of Local 57, submitted a proposed bargaining contract to Stewart Pascoe, Hested's Great Falls store manager. Between that date and February 10 there were numerous conferences, personal and by telephone, between representatives of Hested and Local 57, which will be discussed later herein.

On February 9, 1960, Local 57 commenced picketing Hested. The picket sign read as follows:

> This Hested Store Has No Clerk's Union Contract And Non-Union Clerks. Patronize Union Clerks

On March 1, 1960, Hested filed an amended representation petition pursuant to section 9(c) of the Act, wherein it was stated that Local 57 claimed to be the representative of its employees. On the same day, Hested filed an unfair practice charge against Local 57, claiming a violation of section 8(b) (7) (C). After investigation by the Board, an election was directed by the Regional Director and the charge dismissed, pursuant to Section 102.81, Rules and Regulations of the Board. Local 57 filed objections to the election, a request for postponement, and a request for an order directing Hested to furnish it with a list of employees. All were refused, and Local 57 filed with the Board a request to appeal from the order directing the election and the dismissal of Hested's unfair labor practice charge. The Board denied the request to appeal.

On March 18, 1960, a representation election was conducted by the Board at

tion has been filed the Board shall forthwith, without regard to the provisions of section 9(c) (1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up,

deliver or transport any goods or not to perform any services.

"Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8(b)."

2. Having reached this conclusion, petitioner is required by section 10(l) of the Act to petition the court for a temporary injunction against a continuation of the unfair labor practice.

3. Within the meaning of sections 2(5), 8 (b) (7), and 10(l) of the Act, 29 U.S. C.A. §§ 152(5), 158(b), (7) 160(l).

4. The alleged unfair labor practice occurred within this judicial district. The court accordingly has jurisdiction under section 10(l) of the Act.

which Hested's employees voted unanimously against representation by Local 57. The picketing ceased until May 3, 1960, when it was resumed and has continued to the present. On June 8, 1960, Hested filed this unfair labor practice charge against Local 57, under section 8(b) (7) (B) of the Act. The substance of the charge is that Local 57 is picketing Hested with an object of forcing or requiring Hested to recognize or bargain with Local 57 as the representative of Hested's employees, or of forcing or requiring Hested's employees to accept or select Local 57 as their collective bargaining representative, notwithstanding that Local 57 is not currently certified as the bargaining representative of the employees and a valid election has been conducted by the Board within the preceding twelve months at which the employees voted against being represented by Local 57.

No charge has been filed with the Board that Hested has unlawfully recognized or assisted any labor organization in violation of section 8(a) (2) of the Act.

Having concluded that there is reasonable cause to believe that the charge filed June 8, 1960, is true, the Regional Director petitioned this court for an injunction pending final adjudication of the charge before the Board. In opposition to the Board's petition, respondent argues: (1) the March 18 representation election was invalid, therefore section 8 (b) (7) (B) does not apply; (2) there is no evidence in the original picketing, prior to the election, that Local 57 attempted to force or require Hested to grant recognition; and (3) in any event, the present picketing is merely informational in nature and allowed by section 8(b) (7) (C).

A hearing was held July 21, 1960, at which testimony and exhibits were offered by both parties. While much of the evidence is undisputed, there is a conflict in the testimony regarding what was said by representatives of the respective parties in the personal and telephone conferences, both with respect to the precise language used and inferences to be drawn therefrom.

At the outset, it should be made clear that the function of this court upon presentation of a petition for injunction pursuant to section 10($l$) of the Act is to ascertain whether the Board had "reasonable cause to believe" that the charge was true. Douds v. Milk Drivers and Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534, 538; Alpert v. Truck Drivers, D.C.Me.1958, 161 F.Supp. 86; McLeod v. Local 239, International Brotherhood of Teamsters, D.C.E.D.N.Y. 1960, 179 F.Supp. 481. It is not necessary to find that the charges are true and that there has been a violation of the Act in order to grant relief; nor is a denial of relief here a judicial indication that the charges filed are untrue. McLeod v. Local 239, supra, and cases therein cited. Nor is it the function of this court to resolve conflicts in the testimony or any reasonable inferences which may be drawn therefrom.

Respondent contends that the election was invalid because (1) it lacked due process, and (2) was conducted unfairly and "without giving the parties equal opportunity to present the matter to the employees before the vote". An expedited election was held pursuant to the provisions of section 8(b) (7) (C) of the Act and section 102.77(b) of the Rules and Regulations of the National Labor Relations Board. The Director determined that a hearing prior to election was not required. The Board denied respondent's petition to appeal from the Director's direction of the election. The procedure followed was in all respects consistent with the provisions of the Act and the rules and regulations and statements of procedures of the Board. Did it violate due process in holding an election without first according respondent an opportunity to be heard? Due process does not require a pre-election hearing. Inland Empire District Coun-

cil, etc., v. Millis, 1945, 325 U.S. 697, 65 S.Ct. 1316, 89 L.Ed. 1877.[5]

▉ The validity of the election and procedures followed by the Board are not proper subjects for inquiry here. The validity of the election goes to the substance of the unfair practice charge. The resolution of this charge is within the exclusive jurisdiction of the Board. Respondent will have an opportunity to present to the Board any evidence in support of its contention that the election is invalid. The Act provides specifically for judicial review from the final order of the Board. Section 10(e) and (f). See also Biazevich v. Becker, D.C.S.D.Cal. 1958, 161 F.Supp. 261. The election proceedings are not reviewable in this injunction proceeding. Elliot v. Dallas General Drivers, N.D.Texas 1959, 38 CCH L.C. para. 65,988. That a representation election was conducted by the Board, and that respondent was not certified as the representative of the employees of Hested by virtue of that election, preclude any further inquiry here as to whether the Board had "reasonable cause to believe" that an election was held within twelve months prior to the alleged charge.

▉ The question to be decided here is whether petitioner had reasonable cause to believe that the picketing carried on by respondent had as an object to force or require Hested to recognize or bargain with it as the representative of Hested's employees, or to force or require the employees to accept or select respondent as their collective bargaining representative. In my opinion the Board clearly had reasonable cause to believe that an object of the initial picketing between February 9 and March 18, when the representation election was held, was to force and require recognition and organization.

It is undisputed that on January 9, 1960, the business agent of Local 57 presented a contract to Hested's store manager, and urged immediate acceptance, and that from time to time the business agent and counsel for Local 57 requested Hested to furnish them with a list of Hested's employees. The business agent testified that they "forgot about recognition and organizing" two or three days before the election.

Pascoe, the store manager, testified in part that he was told by Meyer, the business agent, on January 15 that Hested would have to "get on the ball, that the union wanted to get the matter settled before the store opened"; that in the same conversation, Meyer described the picketing of other stores and indicated that it hurt business; that on the morning of January 19 when Meyer was told by Daryl Melius, Hested's personnel director, that Melius "could sign nothing", Meyer replied that, "It looks like we will have to picket. We don't have any other choice"; that Leo Graybill, Jr., respondent's counsel, called him on January 27 and asked whether Hested intended to sign a contract and be a "union house", and said that if not, "The union would have to take matters into its own hands".

Melius confirmed Pascoe's testimony regarding the morning conference on January 19 and testified that at another conference in the afternoon of the same day, at which the president of the local union was also present, Meyer said that, "We will have to picket if you don't furnish a list"; that in a telephone conversation with Graybill on January 27, Graybill said that they wanted to know whether Hested planned to affiliate with the Employers Council or sign a separate contract, and when Melius could not give him any answer, Graybill said, "We want to know your intention at once. We can't sit still"; that he talked with Graybill

---

5. See also Ewing v. Mytinger & Casselberry, 1950, 339 U.S. 594, 598, 70 S.Ct. 870, 872, 94 L.Ed. 1088, where the Court said: "At times a preliminary decision by an agency is a step in an administrative proceeding. We have repeatedly held that no hearing at the preliminary stage is required by due process so long as the requisite hearing is held before the final administrative order becomes effective."

again on February 10 and in this conversation Graybill said the union was picketing, no longer desired a list of employees, and was not interested in organization or recognition, but also asked what Hested was going to do regarding "unionization", and when Melius replied that he could not give any answer, Graybill said that if Hested did not go union, they would picket and stay "until the cows come home". Graybill denied making this statement.

Whether or not Meyer and Graybill used the precise language attributed to them by Pascoe and Melius, this court is not so naive as to believe that between January 9 and the time of the election, respondent did not have as its object to force and require recognition. This in effect is confirmed by Meyer's own testimony that they "forgot about organizing" shortly before the election.

The substance of the 8(b) (7) (B) charge here, however, deals with respondent's conduct within the twelve-month period subsequent to the March 18, 1960, election. The crucial question for determination is this: Did the petitioner have reasonable cause to believe that the picketing which began May 3, 1960, had as its object to force or require recognition or organization, as petitioner contends; or is this picketing solely for the purpose of truthfully advising the public (including consumers) that Hested does not employ members of, or have a contract with, a labor organization, as respondent contends?

In contending that there was reasonable cause to believe that the picketing which began on May 3, 1960, has an object of recognition or organization, petitioner urges: (1) that the exception contained in 8(b) (7) (C) is not applicable to a proceeding under 8(b) (7) (B); (2) that the picketing which was resumed on May 3 was in effect a continuation of the prior picketing, with the same object and purpose; and (3) that the following specific acts subsequent to May 3 support the contention that the resumed picketing had a continuing object of recognition and organization: (a) on May 18, 1960, a driver of a paper products supplier refused to make his delivery to the picketed store; (b) on June 13, 1960, an automotive repairman refused to enter the picketed store; and (c) on June 15, 1960, the picket informed a representative of Hested that the picketing would continue until Hested's employees joined the union.

█ It is clear from the legislative history of the 1959 Amendment to the National Labor Relations Act that in enacting section 8(b) (7) (B) Congress intended to promote the orderly resolution of questions concerning representation to protect the rights of employers and employees alike by prohibiting all picketing for recognitional and organizational purposes for a period of twelve months following a Board-conducted election.[6] Neither the House nor Senate versions of the bill contained any provision relating to informational picketing.

**6.** See discussion of legislative history in Cavers v. Teamsters "General" Local No. 200, D.C.E.D.Wis.1960, 188 F.Supp. 184, in which Judge Tehan quotes from testimony of Secretary of Labor Mitchell before the Senate Labor Committee, and from Senators Kennedy, Goldwater, and Morse, and Representatives Thompson and Udall of the House Labor Committee. Senator Morse, in discussing the Conference Report, said: "Suppose there has been an election, and the union has lost overwhelmingly. The day after the election is over, bingo, there is another picket line. I think both the employer and the public are entitled to some pro-

tection in such a case. It is perfectly fair to have a rule that under such circumstances a picket line cannot be stretched in that kind of labor dispute, for a reasonable period of time * * *

" * * * I do not believe that the day after the vote, the employer should have to wake up and see a picket line in front of his plant. * * * I think it is reasonable to provide rules of the game, so to speak, that will give such an employer protection from having a picket line stretched before his plant, for at least a reasonable period of time."

The proviso contained in 8(b) (7) (C) was inserted in the final version of the bill as formulated by the conferees,[7] apparently in recognition of the right of free discussion guaranteed by the Constitution.[8]

Petitioner contends first that the informational picketing proviso is limited to subparagraph (C) and affords no defense to an 8(b) (7) (B) charge. This contention was upheld in the recent case of Penello v. Retail Store Employees, etc., D.C.Md.1960, 188 F.Supp. 192.[9] In a well-reasoned opinion Judge Thomsen recognized, however, that a court must keep in mind even in a section 8(b) (7) (B) proceeding "that there may be picketing which is purely informational in character and which does not have any recognitional or organizational objective". Judge Thomsen continued: "Such picketing is permitted by sec. 158(b) (7) (8(b) (7) (B)), even during the year after an election, not because of the proviso in subparagraph (C), but because

such picketing does not come within the first set of 'where' clauses, which apply to subparagraphs (A) and (B) as well as to (C)." In other words, it is permitted if it does not have an object of forcing or requiring recognition or organization.

The courts have recognized quite generally that all picketing, including informational picketing, pertaining to an employer's failure or refusal to employ union members or to have a collective bargaining agreement, has as its ultimate goal or object union recognition or bargaining.[10] In Greene v. International Typographical Union and Local 285, D.C. D.Conn.1960, 186 F.Supp. 630, 634, in construing the proviso in an 8(b) (7) (C) proceeding, the court said that, "It seems * * * realistic to suppose that Congress framed a general rule covering the field of recognitional and organizational picketing and then excepted from the operation of the rule a comparatively innocuous species of picketing having the immediate purpose of informing or ad-

7. See discussion of legislative history in McLeod v. Chefs, etc., Local 89, 2 Cir., 1960, 280 F.2d 760, 764, 765, including a reference to statement of Representative Udall, a member of the House Education and Labor Committee: " 'The conference report also protects informational picketing that does not result in economic coercion—a right of free speech which would have been denied by the Landrum-Griffin Bill.' 2 Legislative History of the Labor-Managment Reporting and Disclosure Act of 1959, p. 1722, U.S. Government Printing Office, 1959."

8. In Thornhill v. State of Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 744, 84 L. Ed. 1093, it was clearly recognized that "the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution", and that picketing is a practicable and effective means of enlightening the public on the nature and causes of a labor dispute. The safeguarding of this communication was deemed "essential to the securing of an informed and educated public opinion with respect to a matter which is of public concern". On the other hand, it was recognized in Building Service Emp. Intern. Union, Local 262

v. Gazzam, 1950, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045, that peaceful picketing as an exercise of free speech may lose the protection of the constitutional guarantee where its purpose is to compel an employer to coerce his employees contrary to declared public policy.

9. This conclusion seems clear from the legislative history of the 1959 Amendments, including in particular the statement of Congressman Griffin, one of the co-sponsors of the bill, in commenting on the Conference Reports that " * * * The proviso pertains to subsection C only and therefore consumer appeals for organizational or recognitional purposes are banned after an election". 105 Cong.Rec. A7915 (Sept. 10, 1959). See also Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L. Rev. 257, 269 (1959).

10. See Getreu v. Bartenders and Hotel and Restaurant Employees Union Local 58, D.C.N.D.Ind.1960, 181 F.Supp. 738; Brown v. Department & Specialty Store Employees, etc., D.C.N.D.Cal.1960, 187 F. Supp. 619; Greene v. International Typographical Union and Local 285, infra; Cavers v. Teamsters "General" Local No. 200, supra.

vising the public, even though its ultimate object was success in recognition and organization." While this approach is recognized by Judge Tehan in Cavers v. Teamsters Local 200, supra (a proceeding under 8(b) (7) (B)), he suggests that the test to be applied is that of "an inquiry into a reasonably immediate objective of the Union", that the Board and the court are charged with the "duty of determining the intent of the party charged", and that there is no way to determine intent or objective "except through inferences to be drawn from the actions of the parties".

If we accept the premise that all picketing pertaining to an employer's failure or refusal to employ union members has an object of *ultimate* union recognition and organization, then to give recognition and effect to purely informational picketing, by reason of the proviso in 8(b) (7) (C) or otherwise, we must distinguish between the *ultimate object* and the *reasonably immediate object* in determining in any given case whether the picketing has an object of *forcing* or *requiring* recognition or organization. To determine the "intent of the party charged" is often difficult, and it is not surprising that the courts have reached different conclusions on somewhat comparable facts. Nor can it be denied that this recognition of "purely informational picketing" to some extent weakens the

effect of all of the provisions of 8(b) (7) proscribing recognitional and organizational picketing.

We come now to petitioner's contention that the picketing which began on May 3, 1960, was a continuation of the initial picketing, with the same object and purpose. It was held in McLeod v. Chefs, etc., Local 89, supra, however, that a prior objective to force recognition does not necessarily preclude a labor organization from engaging in lawful activity at a later time, and there exists no presumption of the continuity of a state of affairs in construing the legality of picketing where there is no independent evidence to support such a presumption [11] (citing N. L. R. B. v. Local 50, 2 Cir., 1957, 245 F.2d 542, 547).[12]

■ The actions and representations of Local 57 from the outset of its negotiations with Hested may be considered in determining its intent, particularly where, as here, respondent argues that the initial picketing, as well as the picketing subsequent to May 3, 1960, did not have as an object to force or require recognition or organization. Neither the Board nor the court, however, may rely upon the presumption that the initial object continues to the present, unless this presumption is supported by independent evidence of events and representations subsequent to the resumption of the picketing.

[11]. In McLeod v. Chefs, etc., Local 89, the Stork Club had filed a request with the National Labor Relations Board on January 6, 1960, charging an unfair labor practice under section 8(b) (7) (C). After receiving notification of the filing of the charge, officials of the unions met with their attorneys on January 13 and were advised that under the Act they were no longer permitted to picket in order to gain recognition as the bargaining representative of the employees. As a result of this meeting, letters were sent to the National Labor Relations Board and to the Stork Club advising that the unions had withdrawn their demands for recognition but would continue picketing for the lawful purpose of advising the public. Signs were changed on January 14. In holding that an injunction had been improperly granted, the court said in part: "The unions clearly announced a change in objective on January 14, 1960 and took action to modify their activity so as to bring it within the sphere of allowable informational picketing permitted by the Act."

[12]. The case of N. L. R. B. v. National Motor Bearing Co., 9 Cir., 1939, 105 F.2d 652, cannot be relied upon as upholding the presumption here without independent supporting evidence. That case held that an employee who had once designated the union as his bargaining agent could be presumed not to have changed his mind, in absence of evidence to the contrary. That is a different situation than exists here, and especially since such a presumption in this case would indicate a violation of the law.

The last direct contact between Local 57 and Hested was Graybill's telephone conversation with Melius on February 10, 1960, the day after the initial picketing started. In respondent's "Objections to the Election" and its "Request for Additional Time and for Order to Release Names", both transmitted to the Regional Director on March 15, 1960, with copy to Hested, it is recited that the Union has not sought recognition or organization of the employees. The request for permission to appeal contains the recital that, "To date the Union has had no formal opportunity to prove that it did not seek recognition nor organization, although it has repeatedly so stated." The withdrawal from the election contains a similar recital. The initial picketing ceased on March 19, 1960, the day after the representation election.

Picketing was not resumed until May 3, 1960. Either at that time or shortly thereafter, new signs were used in which the words "Patronize Union Clerks" were deleted from the sign used in the initial picketing, so that the picket sign now reads, "Hested Has No Clerk's Union Contract And Non-Union Clerks".[13]

While Local 57 did not give any formal notice to Hested or to the Board when the picketing was resumed on May 3, it was clear from the papers filed by the union between March 15 and 19, that Local 57 no longer sought recognition or organization. This is consistent with Meyer's testimony that they "forgot about organizing" two or three days before the election.[14]

On March 30, 1960, Mr. Graybill, as the attorney for Local 57 and another union, directed a letter to Cascade County Trade and Labor Assembly, calling attention to the fact that Hested had no contract with either of the unions, and stating:

"Consequently, in the near future these unions intend to picket Hested's store for informational purposes only. This letter is to advise you that it is not the intent or desire of these unions to stop deliveries to Hested's store but that they hope to influence the public and friends of organized labor not to make purchases from Hested's store. Please advise any of your members who ask that under the new labor law it is permissible to picket without disturbing deliveries.

"We hope the members of your association will not patronize non-union clerks or waitresses at Hested's store."

While this may be a self-serving document, it is relevant on the question of respondent's intent, particularly in view of petitioner's reliance upon specific acts of failure to make deliveries.

Pascoe, Hested's store manager, testified with respect to four incidents where persons refused to make delivery or perform service by reason of the picket— two in February during the initial picketing, and two subsequent to May 3. He testified that on the morning of May 18, 1960, he ordered some paper cups from Carpenter Supply Company, requesting immediate delivery so that they would be received before lunch. The driver for Carpenter Supply Company refused to make delivery because of the picket. The cups were delivered in the afternoon. On June 13, a mechanic foreman came to Hested's store to tell Pascoe of a change of schedule in repairing Pascoe's per-

---

13. It is uncertain from Meyer's testimony when the legend on the sign was changed, but there is no question that the sign now in use contains the legend quoted above.

14. Had respondent and its counsel frankly recognized and maintained this position, the distinction between the object of the initial picketing and the purpose of the picketing beginning May 3, would be clearer. Instead, respondent, relying upon somewhat confusing semantics, argues that even the initial picketing did not have the object of forcing or requiring recognition or organization, an untenable position under the evidence presented at the hearing.

858

sonal car. He was stopped by the picket, talked with the picket, and returned to his shop without notifying Pascoe of the change in schedule.

Joe DeSmet, an employee of Hested, testified that around the middle of June, 1960, he had a conversation with the picket, in which DeSmet asked the picket "how long he thought he would be out there and he said until we joined up". The picket, Joe Conway, admitted the conversation, and said he meant it as a joke; that he subsequently told DeSmet the union had not told him that he would be there until Hested joined up; that he had never been told by any representative of the union how long the picketing would last, but had been told that "it was an informational picket".

Meyer admitted on cross-examination that it was the union's desire that Hested would have no business from local people and that this would force Hested out of business; but when he was asked the specific question, "So your purpose then was either to have them deal with you on your terms or not operate, wasn't it?", he replied, "No, I just wanted the people to know they were non-union and that the people could decide for themselves".[15]

■ The foregoing constitutes the sole evidence of any actions or repre-

sentations on the part of Local 57 for the two and one-half month period between the resumption of picketing on May 3, 1960, and the hearing on July 21, 1960. It is my conclusion that, while the initial picketing had an object of forcing or requiring recognition and organization, that object was abandoned by respondent on or about March 15, 1960; and that the evidence of respondent's actions and representations thereafter and particularly since picketing was resumed on May 3, 1960, is insufficient to show a reasonably immediate object of *forcing* or *requiring* recognition or organization, but rather manifests an intent to inform the public that Hested does not have a union contract and employs nonunion clerks.[16]

■ While the case is not entirely free from doubt, it is my conclusion that the evidence is insufficient to justify the issuance of an injunction. Injunction relief should be applied with caution. Brown v. Department Store Employees, supra. This does not, however, constitute any judicial determination that Local 57 did not commit an unfair labor practice as charged. That is a question for initial determination by the Board upon a full consideration of all relevant evidence.

Petition denied.

15. There is apparently no contention that respondent ever had as an object the raising of substandard wages or working conditions; nor would such a contention be warranted under the evidence. See Cox, The Landrum-Griffin, Amendments to the National Labor Relations Act, 44 Minn.L.Rev. 257, 266.

16. The fact that respondent withdrew from the election, the interval of six weeks between the two periods of picketing, the lack of any direct communication between respondent and Hested for approximately three months prior to the picketing which began May 3, the legend on the sign, and the lack of any other activity in conjunction with the picketing distinguishes this case factually from Penello v. Retail Store Employees, supra.