John F. LEBUS, Regional Director of the Fifteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

BUILDING AND CONSTRUCTION TRADES COUNCIL OF NEW ORLEANS AND VICINITY, AFL–CIO, and Local 60, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO, Respondents.

Civ. A. No. 11656–B.

United States District Court
E. D. Louisiana,
New Orleans Division.
Nov. 22, 1961.

Stanley A. Mestel, Washington, D. C., Louis A. Fuselier, New Orleans, La., for petitioner.

Kullman & Lang, Frederick A. Kullman, New Orleans, La., for Houston Contracting Co.

Jackson & Hess, Ralph N. Jackson, New Orleans, La., for Building and Construction Trades Council, respondent.

Dodd, Hirsch, Barker & Meunier, C. Paul Barker, Baton Rouge, La., Thomas J. Meunier, New Orleans, La., for Local 60, respondent.

J. SKELLY WRIGHT, District Judge.

This application, filed by the Regional Director of the Fifteenth Region of the National Labor Relations Board pursuant to Section 10($l$) of the National Labor Relations Act as amended,[1] is for a temporary injunction pending the final disposition of charges filed before the Board by Houston Contracting Company alleging that respondents have engaged in and are engaging in an unfair labor practice within the meaning of § 8(b) (7) (C)[2] of the Act, which section proscribes certain recognitional and organizational picketing. The respondent Building Trades Council is an organization composed of building and construction trade unions and the respondent Plumbers Union is a member of the Council. Both respondents function as labor organizations promoting and protecting the interests of their respective members and members of affiliated labor organizations.

Houston is currently engaged in two types of construction work in Louisiana. Houston has pipeline construction jobs now under way at Lafayette, Melville and Lake Providence, Louisiana. As to these jobs, Houston is a signatory to the National Pipeline Agreement and as such its employees working on pipeline construction, including those at Lafayette, Melville and Lake Providence, are members of or represented by various labor unions, including locals of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO. In addition, and of primary concern here, Houston is currently engaged in the construction of a gas compressor station at Port Sulphur, Louisiana. Houston's employees at Port Sulphur are not represented by a labor organization.

When the work at Port Sulphur began in June, 1961, respondents, through their officers, contacted representatives of Houston, requesting a conference with management concerning the labor to be used on the job. After some unsuccessful efforts to obtain the conference, respondents were told that the job would be non-union. Thereupon picketing began at the job site, the signs being in the language of the second priviso[3] in § 8(b) (7) (C) of the Act. The signs read:

"This picket is to advise that Houston Contracting Co. does not have an agreement with Bldg. & Const. Trades Coun. of N. O. and Vicinity, AFL–CIO."

This picketing has continued to date, although interrupted at times by arrests of the pickets by the deputies of the Sheriff of Plaquemines Parish, Louisiana.[4] During the picketing there have been isolated refusals on the part of delivery trucks to deliver at the job site. In every case of refusal, however, the

---

1. 29 U.S.C.A. § 160($l$).

2. 29 U.S.C.A. § 158(b) (7) (C).

3. The second proviso reads: *"Provided further,* That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services." 29 U.S.C.A. § 158(b) (7) (C).

4. This court enjoined the Sheriff of Plaquemines Parish from interfering with respondents' peaceful picketing. Wooton v. Ohler, Civil Action No. 11408, E.D.La., August 31, 1961.

supplies were received at the job site, either by having an employee of Houston drive the truck past the picket line or by making the deliveries at places where the picket line would not have to be crossed. These isolated interruptions have not affected work at the job site, which work is proceeding on schedule, according to the president of Houston.[5]

■ On October 4, 1961, pickets of respondent Plumbers appeared at Houston's job sites in Lafayette, Melville and Lake Providence. This picketing did not affect the pickup or delivery of any supplies to these job sites, although some employees of Houston did refuse to cross the picket lines. Picketing at these locations was discontinued on October 6, 1961, and has not recommenced.[6] On October 6, 1961, Houston filed with the Board a charge against respondents alleging violations of § 8(b) (7) (C) of the Act. The Board's complaint herein, alleging reasonable cause to believe that the charges are true, was filed October 24, 1961.

The Board's principal contention is that the object of the picketing at the Port Sulphur site is recognition or organization and, since it has persisted for a period of more than 30 days without a petition for an election under § 9(c) [7] of the Act being filed,[8] the picketing is an unfair labor practice under § 8(b) (7) (C). The Board also contends that the "effect of such picketing is to induce" individuals employed by other persons in the scope of their employment not to pick up, deliver or transport any goods or not to perform any services at the job site. In any event, the Board suggests that this

5. Petitioner asserts there were three instances of refusal to cross the picket line. One delivery truck driver testified that on some six occasions he made deliveries to the Port Sulphur site but, rather than cross the line, he would telephone Houston and Houston's employees would come out and pick up the goods. Another truck driver testified that while on his way to the Port Sulphur site he was followed by several Houston employees who asked him if he had a delivery for Houston. When he replied that he did, they relieved him of the goods and made the delivery themselves. In response to a question by the court, the driver admitted that the picket line did not stop him, but that he knew the picket line was there and "intended" to call Houston to come get the goods. In any event, he never had the opportunity to refuse to make the delivery. It was stipulated that on one occasion a truck filled with blasting sand stopped at the line and a Houston employee drove it across, made the delivery, and then returned the truck to its driver at the edge of the site.

There is no evidence that respondents even knew of the first two instances and there is no evidence that respondents' pickets exerted any effort to stop any deliveries.

6. There is no reasonable cause to believe that the picketing at these locations constituted a violation of § 8(b) (7) (C). The only evidence of interference with work progress there involved Houston's employees. To come within the prohibi-

tion of § 8(b) (7) (C), the picketing must induce "any individual employed by *any other person*" to refuse to make deliveries. (Emphasis added.)

7. 29 U.S.C.A. § 159(c).

8. At the outset, respondents assert that since Houston is engaged primarily in the construction industry, under § 8(f) of the Act respondent may demand a contract before acquiring majority status. 29 U.S. C.A. § 158(f). Further, since Houston refused to enter into such an agreement, respondent claims it may picket without falling under the proscription of § 8(b) (7). This court need not now consider the correlation between § 8(b) (7) and § 8(f) because the legislative history makes clear that Congress envisioned a voluntary agreement, without picketing, under these circumstances. The House managers of the 1959 Act, in their report on the Joint Congressional Conference, stated:

"The conference adopted the provision of the Senate bill permitting prehire agreements in the building and construction industry. Nothing in such provision is intended to restrict the applicability of the hiring hall provisions enunciated in the Mountain Pacific case (119 N.L.R.B. 883, 893) or to authorize the use of force, coercion, strikes, or picketing to compel any person to enter into such prehire agreements." I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 946. U.S. Code Cong. & Adm.News 1959, p. 2514.

record at least shows reasonable cause to believe that the Act has been violated and that consequently, under § 10($l$), the injunction should issue.

■ The initial consideration is that this is a statutory injunction. After the regional attorney determines that there is a reasonable cause to believe that the facts alleged in the charge are true and that a complaint should issue, the district court has jurisdiction to grant whatever relief it deems "just and proper."[9] The considerations are not those which usually attend the injunctive process between private litigants,[10] the primary concern of the court being directed to the effectuation of the policy of a federal statute and the maintenance of the status quo until the Congressionally appointed agency may complete its weighing of the merits of the charge.[11]

■ The labor injunction dwells in a sensitive area. "When Congress itself has struck the balance, has defined the weight to be given the competing interests, a court of equity is not justified in ignoring that pronouncement under the guise of exercising equitable discretion."[12] The court must view the preliminary charge precisely as the Board presents it and not cast about for other potential violations on the facts presented. Only in this way can the court show proper respect for the expertise of the Board, fulfill its duty under the Act, and justly administer the weighty power of the injunctive process.[13] Simply stated, then, the court must decide whether there is reasonable cause to believe, on the evidence presented, that the alleged violation of the Act has been committed as charged.

Section 8(b)(7) of the Act, as amended by Landrum-Griffin, prohibits picketing by a union which is not the certified representative, where an object thereof is recognition or organization: under Paragraph (A), if another union has been lawfully recognized and an existing contract with that union bars an election; under Paragraph (B), if a valid election has been held among the employees by the Board during the preceding twelve months; and under Paragraph (C), if conducted for more than a reasonable period, not to exceed 30 days, without the filing of a petition for an election under § 9(c) of the Act. Unlike Paragraphs (A) and (B), however, Paragraph (C) specifically permits informational picketing provided deliveries to the job site continue uninterrupted. Section 8(b)(7) is, of course, an integral part of the comprehensive scheme devised by Congress to protect the rights of employees and employers and to stabilize labor relations.

Although prior to Landrum-Griffin the Act guaranteed to employees the right to refrain from union activities as well as the right to engage in them, until the recent amendments became effective on November 13, 1959, the Act, with some exceptions[14] not pertinent here, did not expressly prohibit a union from picketing a job to compel the employer to recognize it as the bargaining agent of his employees or to compel the employees to join or select it as such bargaining agent. As a result, unions which did not represent a majority of the employees in a plant were permitted freely to engage in recognitional picketing, i. e., picketing designed to force an employer

9. 29 U.S.C.A. § 160($l$).

10. Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 897, 88 L.Ed. 754.

11. Madden v. International Organization, etc., 7 Cir., 259 F.2d 312; Douds v. Milk Drivers and Dairy Employees Union, etc., 2 Cir., 248 F.2d 534.

12. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 609–610, 72 S.Ct. 863, 897, 96 L.Ed. 1153 (concurring opinion of Mr. Justice Frankfurter).

13. National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 343, 60 S.Ct. 918, 84 L.Ed. 1226.

14. The exceptions, briefly, were provisions which outlawed picketing for recognition or bargaining where another union had been certified by the Board as the bargaining agent (§ 8(b)(4)(C), and the "sympathy strike" provisions, which forbade strike action against one employer to force another employer to recognize or bargain with a union (§ 8(b)(4)(B)).

to recognize or bargain with it as the representative of employees, notwithstanding the fact that the employees had never designated it to act as such, or organizational picketing, i. e., picketing to compel employees to join the union and designate it as their bargaining agent.

The sponsors of Landrum-Griffin would have outlawed altogether recognitional and organizational picketing unless the union could show that at least 30 per cent of the employees had already designated it as their bargaining agent, and even in that event the union would have have been permitted to picket only for a reasonable period, not to exceed 30 days, if no representational petition were filed with the Board to secure a determination of the question of representation.[15] Nor was the second proviso of § 8(b) (7) (C) included in the bill as originally drafted. Objections, however, were raised to these provisions of the Landrum-Griffin bill as being too restrictive,[16] and § 8(b) (7) (C) in its present form was enacted as a compromise.[17] The compromise not only eliminated the 30 per cent requirement, but also, because of constitutional implications respecting free speech,[18] added the second proviso permitting informational picketing to advise "the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services."[19]

The Board would have § 8(b) (7) (C) read as condemning all picketing which persists more than 30 days where one of the objects is recognition or organization, despite the fact that the picketing is not attended by coercive effects such as failure of deliveries. How the Board comes to this conclusion is difficult to understand. The second proviso of § 8(b) (7) (C) is part thereof and obviously must be read as qualifying the preceding part. The section condemns, under some circumstances, recognitional and organizational picketing, but further provides, in the second proviso, that picketing which does not have the coercive effect outlined in the proviso shall be permitted. If picketing is neither organizational nor recognitional, it does not violate the section. As to such picketing, the second proviso serves no purpose. Its usefulness is limited to permitting certain picketing otherwise condemned in § 8(b) (7) (C). The Board would read the second proviso as a separate section unrelated to § 8(b) (7) (C). The Supreme Court, without so holding, has apparently come to a different conclusion. National Labor Relations Board v. Drivers, Chauffeurs, Helpers, Local Union, 362 U.S. 274, 291, 80 S.Ct. 706, 716, 4 L.Ed. 2d 710, in discussing recognitional and organizational picketing under § 8(b) (7) (C), states: "While proscribing peaceful organizational strikes in many situations, it also establishes safeguards against the Board's interference with legitimate picketing activity. See § 8 (b) (7) (C)."

■ The interpretation of the proviso as permitting non-coercive informational picketing, irrespective of other hopes and intentions, should be so obvious to anyone with a modest understanding of the

15. H.R. 8400 as Referred. I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 684–685.

16. II id., p. 1576 (remarks of Speaker Rayburn).

17. II id., p. 1431 (remarks of Senator Kennedy); I id., p. 966 (Senate Committee Analysis).

18. See II id., p. 1427 (remarks of Senator Morse); II id., p. 1722 (remarks of Representative Udall). See also McLeod v. Chefs, Cooks, etc., Local 89, Hotel and Restaurant Emp. and Bartenders Intern. Union, 2 Cir., 280 F.2d 760, 765; Graham for and on Behalf of N. L. R. B. v. Retail Clerks Intern. Ass'n, Local No. 57, D.Mont., 188 F.Supp. 847, 855.

19. 29 U.S.C.A. § 158(b) (7) (C).

English language that resort to the legislative history should be unnecessary.[20] Nevertheless, the legislative history clearly supports this view. Senator Kennedy, Senate Manager for the Congressional Conference on the 1959 Act, explained the second proviso of § 8(b) (7) (C) as follows:

> "Under our substitute proposal organizational picketing can take place only under limited conditions. All are in our opinion most fair and equitable.

> "First. A union may use pickets in an effort to organize until there is an election in which the NLRB can determine the employees' wishes. But a union which is stopping truck deliveries or other employees would not be allowed to avoid an election.

> "Second. Picketing, in the absence of a contract or an election, which has only the effect of notifying the public of non-union conditions, and asking the employees to join the union would not be banned." [21]

Moreover, the courts which have considered the second proviso of § 8(b) (7) (C) consistently read the proviso as a limitation on the subsection of which it is a part.[22] Suffice it to say that the clear intent of § 8(b) (7) (C) is to exclude from the prohibition of the Act picketing which, while embracing the proscribed object of recognition or organization,[23] nevertheless meets the condition, first, of truthfully advising the public that an employer does not have a contract with a labor union, and, second, of not inducing any individual employed by another not to pick up, deliver or transport goods or perform services.

Thus the major premise of petitioner's argument falls, and the Board is relegated to showing that the isolated delivery failures at the Port Sulphur site deny respondents the right to continue their picketing. As stated above, these isolated incidents in no way affected the progress of the work and all deliveries were, in fact, made. As a matter of fact, numerous deliveries by some 24 suppliers were, and are being, made to the job site without interference or interruption of any kind. Pickets are at pains not to encourage refusals to cross the picket line. If there were any real intention on the part of the union to stop deliveries, undoubtedly there would be more respect for the picket line.

Picketing, as the Supreme Court has many times held, is more than free speech.[24] It is often attended by coercive

20. Webster's New International Dictionary, 2d Ed., defines "proviso" at p. 1995: "An article or clause in any statute, contract, grant, or other writing, by which a condition is introduced, usually beginning with the word *provided;* a conditional stipulation that affects an agreement, law, or the like."

21. II Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1377.

22. Graham v. Retail Clerks Intern. Ass'n, Local No. 57, supra, 188 F.Supp. 855; Brown v. Department and Specialty Store Employees Union, N.D.Cal., 187 F.Supp. 619; Greene, for and on Behalf of N. L. R. B. v. International Typographical Union, D.Conn., 186 F.Supp. 630; Getreu v. Bartenders and Hotel and Restaurant Emp. Union, N.D.Ind., 181 F.Supp. 738. See also Cox, The Landrum-Griffin Amendments to the National Labor Relations Act. 44 Minn.L.Rev. 257, 259 (1959).

23. Compare Graham v. Retail Clerks Intern. Ass'n, Local 57, supra, and Penello for and on Behalf of N. L. R. B. v. Retail Store Employees Local Union No. 692, D.Md., 188 F.Supp. 192, which hold that under §§ 8(b) (7) (A) and (B) informational picketing is permitted despite the absence therein of a provision comparable to the second proviso of § 8 (b) (7) (C) provided recognition or organization is not the primary object thereof.

24. International Brotherhood of Teamsters, etc. v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347; Building Service Emp. Intern. Union v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045; Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Bakery and Pastry Drivers and Helpers Local, etc. v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178; Carpenters and Joiners Union etc. v. Ritter's Cafe, 315 U.S. 722,

## 634

side effects. This is why in many cases it is not given the constitutional protection of the First Amendment.[25] Here the coercive effects were insignificant, and this phenomenon can only be explained by assuming that the union did, in fact, desire to exercise its right under the second proviso of § 8(b) (7) (C) to inform the public, including consumers, that the job was non-union. The union knew that it would be able to maintain its informational picket lines only so long as coercive effects did not result. Since they did not, except in these isolated instances, it must be assumed that the primary purpose of the picketing was information and thus protected by the Act.

The facts of this case closely parallel those of Kennedy v. Retail Clerks Union Local 324, S.D.Cal., 194 F.Supp. 131, 135, which denied the petition of the Regional Director of the Board for a temporary injunction against informational picketing at certain stores in south California. There Judge Yankwich said: "This is not a case where the facts so palpably contradict expressed intention that they should

be given primacy. * * * To the contrary, here the facts coincide with the contemporaneously expressed intent to limit the picketing to a small but legitimate area, namely, appeal to the public,— of whom labor union members and their families and sympathizers are a part,-- not 'to patronize' merchants who, in their business or in some department of their business, do not employ union men. * * "

Although picketing was given, it now appears, only the patina of constitutional free speech in Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, nevertheless, any statutes which limit picketing must be carefully examined, if not actually weighed.[26] It is. true that Thornhill has been severely maimed and may, in fact, be breathing its. last, but until it is given a decent burial, a court at this level must make certain that there is not some remaining vitality, perhaps just an afterglow, which would protect non-coercive, peaceful, informational picketing with no substantial side effects. Any statute which would condemn such picketing may still fail the constitutional test,[27] balancing or other-

62 S.Ct. 807, 86 L.Ed. 1143; Milk Wagon Drivers Union, etc. v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836.

25. As Mr. Justice Black observed in writing for a unanimous court in Giboney v. Empire Storage & Ice Co., supra, 336 U.S. 502, 69 S.Ct. 691:

"* * * But it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. * * *"

And to the same effect is Mr. Justice Douglas:

"Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing made it the subject of restrictive regulation." Bakery and Pastry Drivers and Helpers Local, etc. v. Wohl, supra, 315 U.S. 776, 62 S. Ct. 819 (concurring opinion).

26. Even in Teamsters, etc. v. Vogt, Inc., supra, in which Mr. Justice Douglas, dissenting, stated, at p. 295, 77 S.Ct. at p. 1172, that the Court had come "full circle" from Thornhill, Mr. Justice Frankfurter, for the Court, insisted, at p. 294, 77 S.Ct. at p. 1171, that "[T]he mere fact that there is 'picketing' does not automatically justify its restraint without an investigation into its conduct and purposes." This court's limited jurisdiction to find reasonable cause and do what is just and proper does not blind the court to the fact that it has the most potent weapon in labor-management relations in its hands and the First Amendment at its elbow.

27. See II Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1427 (remarks of Senator Morse); id., p. 1833 (remarks of Senator Douglas); id., p. 1729 (remarks of Representative Roosevelt); McLeod v. Chefs, Cooks, etc., Local 89, Hotel and Restaurant Emp. and Bartenders Intern. Union, supra, 280 F.2d 765; Williams, Freedom to Speak—But Only Ineffectively, 38 Texas L.Rev. 373 (1960).

wise. Consequently, this court prefers to read the statute so as to avoid this possibility.

Application denied.